OLIVERIO GIANNOTTI et al., Respondents, *v.* WILLIAM PETERS et al., Appellants.

Judgment affirmed, with costs.

BERGAN, J. (dissenting). Plaintiffs were injured when a projecting portion of scaffolding that had been lashed to a truck on which they were riding caught in a tree above the Eighty-Sixth Street Transverse Road in Central Park and, by shifting the scaffold, threw them from the truck. The verdict against the owner of the truck was well founded enough, but the verdict against the City of New York ought not to stand.

A municipal corporation shares the risk commonly taken by private citizens of incurring a tort liability for failing to guard against dangers reasonably to be anticipated; but in respect of the control of its public parks and public ways it is not required to foresee more danger than prudent municipal management would expect, or to forecast casualties caused by bizarre usages in extraordinary combinations.

The low point of the underpass through which traffic on the Transverse Road was required to move to reach the place of the accident was eleven feet, eleven inches above the pavement in the westerly lane of traffic. The city would be safe, therefore, in believing that no vehicle, any part of which projected higher than this, would be able to use this portion of the Transverse Road; and while there is some opinion evidence in this record that it is "good traffic engineering practice" to maintain "limbs and branches" over streets and highways sixteen feet above the pavement, this was in part based on an assumed rigid clearance of fourteen feet and an allowance of two feet for the weighting down of branches by snow and moisture.

Conceptions of theoretical general practice must here yield to the actuality of a low rigid clearance of eleven feet and eleven inches in the lane in which the accident occurred and to the actual conditions at the time of the accident in which snow and moisture played no part.

The scaffold contained a handrailing fastened by a cradle iron. The scaffold was so placed on the truck that one end of it projected diagonally upward and forward over the top of the cab, approximately as far in front as the radiator of the vehicle, the other end slanting downward back to the end of the truck which had an open body.

The scaffold was so loaded that the handrailing was at the very top projecting above, upward and forward in the air about two feet above the main body of the scaffold. The cradle iron formed an angle under the railing as it projected forward. The end of this single rapier-like handrailing projecting upward and forward as the truck moved was 10 feet 9⅝ inches above the pavement.

It would be hard to conceive of a mechanical combination better suited to ensnare overhanging trees than this projecting single railing and the iron which made the closing angle under it. The evidence shows clearly that they did catch and ensnare an overhanging portion of the tree. Its entrapping force broke off a branch at a point which was measured at thirteen feet two inches above the pavement and about a foot and a half above the highest point reached by the scaffold rail. A witness to the accident said a branch of the tree was "stuck in the scaffold."

There is no proof of the actual distance above the pavement of the portion of the tree that was caught in the rail. Such portions of the tree necessarily had to be at a level where the projecting point of the handrail would have thrust into it; but this point was 10 feet .95⅝ inches above the ground, and since no vehicle of any kind higher than eleven feet eleven inches could get through the underpass, it is reasonable to assume that no undue danger would be anticipated from overhanging trees in a public park being somewhat below the height of the underpass clearance.

Ordinarily it would be expected that vehicles using the Transverse Road would be well within a margin of safety below the underpass clearance and no one could be required to foresee at risk of liability that the highest point of a vehicle would be this unusual kind of projection which approximated the maximum height of clearance.

When the truck came to the underpass it was "slowed up" and inquiry and observations made as to whether there was room to get through. The testimony from which the actual height of the portion of the tree is sought to be inferred by plaintiffs was given by two bus drivers that "twigs rubbed across" the top of a bus "about nine feet" high. "You could hear the twigs rub." One bus driver could not identify the particular branch and another said merely that he noticed that "the branch" was "low" for "about two years."

The actual point where the branch broke off on being ensnared in the truck's cargo, as had been noted, was thirteen feet two inches above the pavement; and measurements in the record disclose that the branch was connected with a limb fourteen to fifteen feet above the pavement and that the limb was connected with the main tree trunk eighteen feet six inches above the pavement. To impose municipal liability in the situation is to require the city to insure against the result of the most unpredictable and vagrant of casualties.

The judgment against the City of New York should be reversed and the complaint as against that defendant dismissed.

Cohn, J. P., Breitel, Bastow and Botein, JJ., concur in decision; Bergan, J., dissents, in part, in opinion.

Judgment, so far as appealed from, affirmed, with costs. No opinion.